UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

MARC DEVEAUX,

                Plaintiff,

-against-

PETER A. BORDES, JR.,

                Defendant.

USDC SDNY
DOCUMENT
ELECTRONICALLY FILED
DOC #: _____
DATE FILED: _9/10/2024_

23 Civ. 1115 (AT)

**ORDER**

ANALISA TORRES, District Judge:

    Plaintiff, Marc Deveaux, alleges that Defendant, Peter A. Bordes, Jr., failed to pay Deveaux the wages he was owed in violation of New Jersey's Wage Payment Law, N.J. Stat. Ann. §§ 34:11-4.1 *et seq.* Compl., ECF No. 5. Bordes counterclaims, asserting that Deveaux owes Bordes wages instead. Answer and Countercl. at 9–12, ECF No. 15. The dispute primarily centers around work that Deveaux performed in the course of his employment at Qandlestick LLC ("Qandlestick"), a company that offered software services to facilitate cryptocurrency transactions. Def. Mem. at 1, ECF No. 42-1.

    Bordes now seeks an order granting summary judgment on Deveaux's claims and dismissing Bordes' counterclaim. Def. Mot., ECF No. 42. For the reasons stated below, the motion is GRANTED.

## BACKGROUND

### I. Factual Background[1]

    Deveaux, Bordes, and their associates founded Qandlestick in 2018. Pl. 56.1 ¶ 1, ECF No. 43-1. Bordes provided the initial funding for the company through his venture capital firm

---

[1] The facts in this section are taken from the parties' Rule 56.1 statements, responses, and declarations, unless otherwise noted. Disputed facts are so noted. Citations to a paragraph in a Rule 56.1 statement also include the opposing party's response. "[W]here there are no citations[,] or where the cited materials do not support the factual assertions in the [s]tatements, the Court is free to disregard the assertion." *Holtz v. Rockefeller & Co.*, 258 F.3d 62,

and served as chair of the board. *Id.* For most of his time there, Deveaux acted as Qandlestick's Chief Technology Officer (CTO), with Ryan Kuiken, another founder, serving as Chief Executive Officer. Def. Mem. at 2; Pl. 56.1 ¶ 2. From the date Qandlestick was founded until its sale in 2021, Bordes, Deveaux, and Kuiken comprised its board of directors. Pl. 56.1 ¶¶ 1–2; Def. Mem. at 2.

In December 2020, Qandlestick entered into a Master Professional Services Agreement (the "Contract") with SEQ Technology LLC ("SEQ"). Pl. 56.1 ¶ 4; Contract at 1, 10, ECF No. 42-4. The Contract stated that Qandlestick would provide SEQ with software consulting services at a rate of $1,000 a day or $125 an hour, should Qandlestick work a partial day. Contract at 10. Although the Contract identified Deveaux as the "Senior Application Developer," it specified that SEQ owed payment to Qandlestick. *Id.* at 1, 10.

The following year, Qandlestick was sold to Fernhill Corp. ("Fernhill"). Pl. 56.1 ¶ 10; Purchase Agreement, ECF No. 42-6. A purchase agreement (the "Purchase Agreement") executed by Bordes and Deveaux provided that Qandlestick's owners would receive $1 million in cash, $11 million in Fernhill common stock, and up to $3 million in an earnout.[2] Purchase Agreement at 15, 60 (§ 2.02). Pursuant to an employment agreement dated November 15, 2021, the date of Qandlestick's sale, Deveaux continued to serve as CTO for Qandlestick, now a division of Fernhill operating under the name MainBloq. ECF No. 42-7; Pl. 56.1 ¶ 10. As part of the sale, on November 16, 2021, Deveaux also signed an "[a]ncillary" general release (the "General Release"), which stated:

---

73 (2d Cir. 2001) (alteration omitted). On a motion for summary judgment, the facts must be read in the light most favorable to the nonmoving party. *Id.* at 69.

[2] "An earnout is a contractual provision stating that the seller of a business will obtain additional compensation if the business meets specified financial targets in the future." Evan Tarver, *Earnout: Definition, How It Works, Example, Pros and Cons*, Investopedia (July 25, 2024), https://perma.cc/G4B9-VW5C.

2

> In consideration for receipt of cash and the shares of stock of Fernhill . . . , the undersigned . . . on behalf of himself and each of his representatives, affiliates, successors and assigns (as applicable) (collectively, the "Releasing Parties"), hereby releases, forever discharges and covenants not to sue [Fernhill], Qandlestick, . . . and any of their respective representatives, directors, managers, members, equity owners, shareholders, officers, attorneys, agents, employees, affiliates, successors or assigns (individually, a "Releasee" and collectively, "Releasees"), from and with respect to any and all claims, dues and demands, proceedings, causes of action, orders, obligations, contracts, debts, obligations and liabilities whatsoever, including, without limitation, any of the foregoing in connection with the sale of [Qandlestick] and related entities to [Fernhill], whether known or unknown, suspected or unsuspected, both at law and in equity, which the Releasing Parties now have, have ever had or may hereafter have, against the respective Releasees, to the extent arising contemporaneously with or prior to the date hereof, and on account of or arising out of any matter, cause or event whatsoever, occurring contemporaneously with or prior to the date thereof.

Purchase Agreement at 7; General Release, ECF No. 42-9; *see also* Pl. Mem., ECF No. 43 at 3. About a year later, Fernhill fired Deveaux, claiming that he breached the noncompete clause in his employment contract by "solicit[ing] and contracting with an existing client of Qandlestick/Mainbloq, namely SEQ." ECF No. 42-8.

II. Procedural History

In February 2023, Deveaux filed this action, alleging that Bordes withheld wages Deveaux earned between December 2020 and January 2022 in violation of the Wage Payment Law. Compl. ¶ 3. Deveaux claims that Qandlestick promised him he would receive 85% of all revenue accrued through his work for SEQ, a figure totaling $185,300. *Id.* ¶¶ 7–10. Deveaux states that Qandlestick paid him only $52,500, leaving an unpaid balance of $132,800.[3] *Id.* ¶ 11. He argues that Bordes was "a 20% shareholder," chair of the Qandlestick board, "*de facto* President of the company," and "actively involved in the management of the company." *Id.* ¶ 13. Therefore, Deveaux contends, Bordes operated as an "employer" under the Wage Payment Law and is personally liable for the missing payments. *Id.* ¶¶ 14–15.

---

[3] Deveaux also seeks $265,600 in liquidated damages. Compl. ¶ 17.

Bordes now seeks an order granting summary judgment on Deveaux's claims and dismissing his counterclaim.  Def. Mot.

## LEGAL STANDARD

A party is entitled to summary judgment if he can establish that there "is no genuine dispute as to any material fact" and that he "is entitled to judgment as a matter of law."  Fed. R. Civ. P. 56(a); *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 247–48 (1986); *Celotex Corp. v. Catrett*, 477 U.S. 317, 322–26 (1986).  A genuine dispute exists "if the evidence is such that a reasonable jury could return a verdict for the nonmoving party."  *Anderson*, 477 U.S. at 248.

In making this showing, the party may rely on "materials in the record, including depositions, documents, electronically stored information, affidavits or declarations, stipulations . . . , admissions, interrogatory answers, or other materials."  Fed. R. Civ. P. 56(c)(1)(A).  The Court views all facts "in the light most favorable to the non-movant, resolving all ambiguities in h[is] favor."  *Borley v. United States*, 22 F.4th 75, 78 (2d Cir. 2021).

## DISCUSSION

I. <u>Summary Judgment</u>

Bordes is entitled to summary judgment because Deveaux released him from "any and all claims," including for unpaid wages, that accrued before Qandlestick's sale.  General Release.

Under Nevada law,[4] a general release functions as a contract, *Chwialkowski v. Sachs*, 834 P.2d 405, 406 (Nev. 1992) (per curiam), so the Court first determines whether its language is "clear and unambiguous," *Am. First Fed. Credit Union v. Soro*, 359 P.3d 105, 106 (Nev. 2015) (quoting *Davis v. Beling*, 278 P.3d 501, 515 (Nev. 2012)).  If it is, "the contract will be enforced

---

[4] The Court interprets the General Release under Nevada law because it is an "ancillary document" "executed in conjunction" with the Purchase Agreement, which in turn states that "[t]his Agreement shall be governed by and construed in accordance with the internal laws of the State of Nevada without giving effect to any choice or conflict of law provision or rule (whether of the State of Nevada or any other jurisdiction)."  Purchase Agreement at 7, 58.

4

as written." *Id.* (quoting *Davis*, 278 P.3d at 515); *see also Chwialkowski*, 834 P.2d at 406 ("An unambiguous contract is construed from the language of the document."). Here, the General Release is unambiguous. It specifies that the "undersigned"—Deveaux—"releases, forever discharges and covenants not to sue" Fernhill, Qandlestick, and "any of their respective representatives, directors, managers, members, equity owners, shareholders, officers, attorneys, agents, employees, affiliates, successors or assigns"—a capacious category that encompasses Bordes. General Release. It covers "any and all claims, dues and demands, proceedings, causes of action, orders, obligations, contracts, debts, obligations and liabilities whatsoever," language that clearly includes a claim for overdue wages. *Id.* And it applies to any such claims arising "prior to the date hereof"—November 16, 2021, the date Deveaux signed the document. *Id.* The General Release's plain language relieves Bordes of liability for Deveaux's unpaid-wage claims that accrued prior to Qandlestick's sale.

The Court rejects Deveaux's argument that the General Release is unenforceable because he did not receive the promised consideration. *See* Def. Mem. at 5–6; *see also Chwialkowski*, 834 P.2d at 406 ("explaining that "[a] release may be rescinded if obtained by mutual mistake or inadequate consideration"). The release lists the relevant consideration: "receipt of cash and the shares of stock of Fernhill Corp, . . . which shares are identified below." General Release. Deveaux does not contest that he received the 91,430,716 shares of Fernhill stock identified in the General Release, but states that he received only $5,000 out of the $310,000 "cash" he claims he was promised under the Purchase Agreement, and therefore is not bound by the General Release's terms. Pl. Aff. ¶ 11, ECF No. 43-2.

      The provision of the Purchase Agreement to which Deveaux refers is Section 2.02:

Purchase Price. The aggregate purchase price for the Membership Interests [in Qandlestick] shall be $15,000,000.00, consisting of $1,000,000 cash (the "Cash

5

>Portion"), $11,000,000 in Common Stock of [Fernhill] (the "Equity
>Portion") . . . [,] and $3,000,000 in an Earn Out (the "Earn Out")[.]

Purchase Agreement at 15. The Court may look to the Purchase Agreement to help determine what the "cash" in the General Release refers to because "parol evidence is allowed to prove mutual mistake, unilateral mistake, or *inadequate consideration*." *Russ v. Gen. Motors Corp.*, 906 P.2d 718, 723 (Nev. 1995) (emphasis added). But if the Court is to consider the terms of the Purchase Agreement, it must account for all the relevant terms. *Cf. N. Las Vegas Infrastructure Inv. & Constr., LLC v. City of N. Las Vegas*, 525 P.3d 836, 840 (Nev. 2023) (explaining that "[c]ontracts must be read as a whole without negating any term" (citation omitted)). Section 2.03 of the Purchase Agreement states that, at the closing of Qandlestick's sale, Fernhill will deliver to the sellers:

>the Cash Portion, less the Indemnification Escrow Amount, as follows:
>(i) $25,000 cash; and (ii) a promissory note in the amount $825,000.00 (the "Note"), which Note shall be due and payable by wire transfer of immediately available funds upon [Fernhill's] receipt of sufficient funding of its pending registered and private offerings or 12 months from [November 15, 2021], whichever occurs first.

Purchase Agreement at 16. Attached to the Purchase Agreement is that promissory note, which states that it is "a general unsecured obligation of [Fernhill]" and specifies how interest will accrue on the principal sum of $825,000 and how that sum will be apportioned between Qandlestick's sixteen owners. *Id.*, Promissory Note at 2, 7.

Deveaux insists that he did not receive the "cash" referred to in the General Release because, as a then-31% owner of Qandlestick, he did not receive 31% of the full million-dollar "Cash Portion," or $310,000. *See* Purchase Agreement at 15; *id.*, Promissory Note at 7; Pl. Aff. ¶ 11. But the "Cash Portion" of the Purchase Agreement does not entitle Deveaux to $310,000 in cash; it entitles him to some unspecified percentage of $25,000 cash and his portion of the

6

$825,000 promissory note.  Deveaux does not contest that he received $5,000 cash upon the sale's closing, nor that Fernhill delivered the promissory note to the sellers.  *See* Pl. Aff. ¶ 11; Pl. Mem. at 5–6; Pl. 56.1 ¶ 11.

The Court concludes that the meaning of "cash" in the General Release, then, is the $5,000 cash that Deveaux received upon the sale's closing.  The document was designed to take effect contemporaneously with the closing of Qandlestick's sale, and the parties did not expect the promissory note to be satisfied until a later date.  *Compare* Purchase Agreement at 15–16 (describing the "ancillary documents" as "transactions to be effected at the closing" (capitalization altered)), *and* General Release (signed on November 16, 2021, the day after Qandlestick's sale), *with* Purchase Agreement at 16 (stating that the promissory note "shall be due and payable by wire transfer of immediately available funds upon [Fernhill's] receipt of sufficient funding of its pending registered and private offerings or 12 months from [November 15, 2021], whichever occurs first"), *and id.*, Promissory Note at 2 (describing how interest on the promissory note will accrue over time).

In sum, according to the undisputed facts, Deveaux received his "cash" and "shares of stock," so he remains bound by his obligations under the General Release.

The Court also rejects Deveaux's argument that the General Release is unenforceable because, when he signed it, "he was not aware that Bordes could be individually liable for unpaid wages and, as such, did not voluntarily and knowingly waive" his claim under the Wage Payment Law.  Def. Mem. at 6.  This is because, "under general principles of contract law, unilateral mistake is not a ground for rescission unless the other party knows or has reason to know of the mistake."  *Gen. Motors v. Jackson*, 900 P.2d 345, 349 (Nev. 1995); *see also Oh v.*

*Wilson*, 910 P.2d 276, 277 (Nev. 1996) ("[U]nilateral mistake standing alone is insufficient to invalidate a release.").

Deveaux's argument that his claim for unpaid wages "does not in any way pertain to the sale of [Qandlestick] to Fernhill" also fails. Pl. Mem. at 6. The plain language of the General Release absolves Bordes of liability for "any and all claims, dues and demands, proceedings, causes of action, orders, obligations, contracts, debts, obligations and liabilities whatsoever, including, without limitation, any of the foregoing in connection with the sale of [Qandlestick] and related entities to [Fernhill]." General Release. This language specifically includes claims arising out of Qandlestick's sale to Fernhill, but it does not exclude other causes of action.

II. <u>Voluntary Dismissal</u>

The Court will also permit Bordes to voluntarily dismiss his counterclaim under Federal Rule of Civil Procedure 41(c). Under the test laid out in *Zagano v. Fordham University*, in deciding whether to grant a motion to voluntarily dismiss a claim without prejudice, a court considers:

> The [counterclaim] plaintiff's diligence in bringing the motion; any "undue vexatiousness" on plaintiff's part; the extent to which the suit has progressed, including the [counterclaim] defendant's effort and expense in preparation for trial; the duplicative expense of relitigation; and the adequacy of plaintiff's explanation for the need to dismiss.

900 F.2d 12, 14 (2d Cir. 1990).

Most of the *Zagano* factors favor granting voluntary dismissal. As to the first, Bordes' diligence in bringing the motion, he first requested leave to dismiss his counterclaim only five months after first bringing it, ECF No. 37, which is not a substantial delay. The second factor, undue vexatiousness, slightly favors Deveaux: Bordes did not initiate this suit, but he should have known when he made his counterclaim that he was not a Qandlestick employee under the

8

Wage Payment Law.[5]  However, the third and "most important" factor strongly favors Bordes: Although this action has progressed to the summary judgment stage, discovery was brief, and opposing the counterclaim did not impose upon Deveaux any burdens beyond those involved in litigating his own claim.  *Enzo Biochem, Inc. v. Harbert Discovery Fund, LP*, No. 20 Civ. 9992, 2022 WL 17361942, at *3 (S.D.N.Y. Dec. 1, 2022).  Fourth, considering that Bordes admits he was not an employee of Qandlestick, it appears highly unlikely that he will try to relitigate his counterclaim in the future.  And fifth, Bordes' explanation for dismissing his counterclaim more than suffices; upon conducting research related to his motion for summary judgment, his attorney concluded that he had no adequate basis on which to state a claim.  *See* Def. Mem. at 18.

## CONCLUSION

For the foregoing reasons, the Court GRANTS Bordes' motion for summary judgment and DISMISSES Bordes' counterclaim.  The Clerk of Court is respectfully directed to enter judgment consistent with this order, terminate the motion at ECF No. 42, and close the case.

SO ORDERED.

Dated: September 10, 2024
       New York, New York

_____
ANALISA TORRES
United States District Judge

---

[5] Bordes represents that he brought his counterclaim to vindicate his rights "to the extent [Deveaux] was somehow correct" about his employee status.  ECF No. 37 at 3.